248 F.3d 309 (4th Cir. 2001)
 D. JOSEPH LONG, individually and derivatively as a shareholder of Regency Home Fashions, Incorporated, Plaintiff-Appellee,
v.
LOUIS L. SILVER, individually and in his fiduciary capacity as a shareholder of Regency Home Fashions, Incorporated and as trustee of the express of the Louis L. Silver living trust; ALL UNKNOWN BENEFICIARIES of the Louis L. Silver Living Trust; RONALD GROSSMAN,individually and in his fiduciary capacity as an officer and shareholder of Regency Homes, Incorporated; KEVIN CREEGAN, individually and in his fiduciary capacity as an officer and shareholder of Regency Homes, Incorporated; REGENCY HOME FASHIONS, INCORPORATED, Defendants-Appellants,
and
HERTZ, HERSON & COMPANY, LLP, certified public accountants, Defendant.
 No. 00-1612
 UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
 Argued: March 2, 2001
Decided: April 27, 2001
 
 Appeal from the United States District Court for the Western District of North Carolina, at Statesville. Carl Horn, III, Chief Magistrate Judge.
 (CA-00-22-5-H)[Copyrighted Material Omitted][Copyrighted Material Omitted]
 COUNSEL ARGUED: Alan Meredith Ruley, BELL, DAVIS & PITT, P.A., Winston-Salem, North Carolina, for Appellants. Paul E. Culpepper, TATE, YOUNG, MORPHIS, BACH & TAYLOR, Hickory, North Carolina, for Appellee. ON BRIEF: James R. Fox, BELL, DAVIS & PITT, P.A., Winston-Salem, North Carolina, for Appellants. Thomas C. Morphis, Sr., TATE, YOUNG, MORPHIS, BACH & TAYLOR, Hickory, North Carolina, for Appellee.
 Before WILKINS, WILLIAMS, and TRAXLER, Circuit Judges.
 Vacated and remanded by published opinion. Judge Williams wrote the opinion, in which Judge Wilkins and Judge Traxler joined.
 OPINION
 WILLIAMS, Circuit Judge:
 
 
 1
 Louis L. Silver, Ronald Grossman, Kevin Creegan, and Regency Home Fashions, Inc. (collectively, "Regency"), appeal from the magistrate judge's denial of their motion to compel arbitration and to stay litigation pending arbitration.[1] Relying upon a line of cases that has been rejected by this Circuit, the magistrate judge held that D. Joseph Long's claims against Regency did not fall within the ambit of the two arbitration agreements at issue. We conclude that the magistrate judge used the improper legal standard for determining whether Long's claims were arbitrable and hold that Long's claims against Regency significantly relate to the two agreements at issue. Accordingly, we vacate the magistrate judge's order and remand the case to the magistrate judge with instructions to compel arbitration and to stay litigation pending the arbitration.
 
 I.
 
 2
 In 1972, Long entered into an agreement with the Silver-Pilzer Corporation ("the 1972 Agreement"). The 1972 Agreement recognizes Long as a current employee and 20% owner in the Regency Bedspread Corporation, of which Silver-Pilzer was an 80% owner. It provides that Long would become a full-time employee in an executive capacity and a 5% equity owner of the Silver-Pilzer Corporation, in exchange for redeeming his stock in the Regency Bedspread Corporation in favor of Silver-Pilzer and for other consideration. The 1972 Agreement further states that Long will continue to be employed by Silver-Pilzer or one of its subsidiaries for as long as he remains a shareholder in Silver-Pilzer. The remainder of the 1972 Agreement deals primarily with Long's ability to dispose of his Silver-Pilzer shares during his employment and upon termination of his employment. The 1972 agreement contains a very broad arbitration clause that provides,
 
 
 3
 [a]ny and all disputes . . . arising out of or in connection with this Agreement, or with respect to the construction and interpretation thereof, or concerning the rights of any one or more parties hereto against any one or more parties hereto, or the respective obligations of each party hereto to each other party hereto, shall be determined by arbitration in accordance with . . . the then existing rules of the American Arbitration Association.
 
 
 4
 (J.A. at 64.) The name of Regency Bedspread Corporation subsequently was changed to Regency Home Fashions, Inc. ("the Corporation"), and Long's shares in Silver-Pilzer became shares in the Corporation.
 
 
 5
 On May 12, 1999, all the shareholders in the Corporation entered into a Shareholders' Agreement ("the 1999 Agreement"). The 1999 Agreement provides for general restrictions on share transfers, a right of first refusal for non-selling shareholders, and the redemption of each shareholder's stock upon termination of that person's employment with the Corporation or upon that person's death. The 1999 Agreement also includes a very broad arbitration clause that provides,
 
 
 6
 [t]his agreement shall be construed and enforced in accordance with the laws of the State of New York applicable to contracts and agreements executed and to be performed wholly in New York. The parties hereby irrevocably and unconditionally agree that any dispute arising out of or relating to this Agreement or the breach, termination or validity thereof will be submitted by the parties to binding arbitration by a single arbitrator to take place in New York City under the rules of the American Arbitration Association then in effect.
 
 
 7
 (J.A. at 81-82.) The 1999 Agreement further provides that it "supersedes any and all prior agreements" that pertain to its subject matter. (J.A. at 83.)
 
 
 8
 Long claims that the shareholders threatened to terminate his employment if he did not sign the 1999 Agreement, and that on May 13, 1999, Silver sent Long a letter informing him that if Long signed the 1999 Agreement, Silver would maintain Long as an employee until he reached the age of 70. Despite this promise, approximately six months after Long signed the 1999 Agreement, Silver fired Long.
 
 II.
 
 9
 On January 19, 2000, Long filed this civil action in the General Court of Justice for the State of North Carolina, Superior Court Division alleging nine claims arising from his shareholder and employment relationship with the Corporation: (1) frustration of reasonable expectation; (2) breach of fiduciary duties; (3) breach of contract; (4) failure to distribute profits proportionately; (5) fraud; (6) civil conspiracy; (7) unfair and deceptive trade practices; (8) punitive damages; and (9) a shareholder's derivative action. Specifically, Long alleged that Silver diverted funds properly belonging to the Corporation for Silver's personal use and that the other shareholders, who became shareholders in 1999, breached their fiduciary duties to the Corporation and to Long by contributing to Silver's schemes to divert funds.
 
 
 10
 On February 4, 2000, Regency removed the action to the United States District Court for the Western District of North Carolina pursuant to diversity jurisdiction under 28 U.S.C.A.S 1332 (West 1993 & Supp. 2000). On March 2, 2000, Regency moved to stay the litigation and to compel arbitration based upon the arbitration clauses in the 1972 and 1999 Agreements. On April 28, 2000, the magistrate judge entered an order denying Regency's motion. On May 8, 2000, Regency filed a notice of appeal with this Court.
 
 III.
 
 11
 Before turning to the merits of Regency's appeal, we first must determine whether diversity jurisdiction is proper.[2] Although the magistrate judge noted that removal "appears to be proper," and jurisdiction has not been challenged by Long, (J.A. at 103), Long alleges in his Complaint that Regency Home Fashions' principal place of business is North Carolina. If this assertion is true, we are bound to dismiss for lack of subject matter jurisdiction because Long also is a citizen of North Carolina. See 28 U.S.C.A.S 1332(c)(1) (providing that a corporation is a citizen of "any State by which it has been incorporated and of the State where it has its principal place of business").
 
 
 12
 In Mullins v. Beatrice Pocahontas Corp., 489 F.2d 260 (4th Cir. 1974) (per curiam), we noted that two divergent approaches exist for purposes of ascertaining the "principal place of business" of a corporation under S 1332(c). "One approach makes the home office, or place where the corporation's officers direct, control, and coordinate its activities, determinative. The other looks to the place where the bulk of corporate activity takes place." See id. at 262 (internal quotation marks omitted); see also Peterson v. Cooley , 142 F.3d 181, 184 (4th Cir. 1998) (noting that we have adopted neither test to the exclusion of the other).
 
 
 13
 The facts that are determinative of the Corporation's principal place of business are not in dispute. Regency Home Fashion's corporate headquarters, sales, and financial offices are located in New York. In addition, the Corporation's president, CEO, and other top officers are all residents of New York. It has one manufacturing plant in North Carolina. The Corporation has no other presence in North Carolina.
 
 
 14
 Regardless of whether the nerve center or the place of operations test applies, we hold that Regency Home Fashions' principal place of business is New York because the undisputed facts establish that the bulk of the corporate activity takes place in New York and that the Corporation's "home office" is located in New York. See Peterson, 142 F.3d at 184 (noting that when a corporation has"multiple centers of manufacturing, purchasing, or sales," we focus on "the place where the bulk of corporate activity takes place" as opposed to the corporation's "home office" (internal quotation marks omitted)).
 
 
 15
 We note that the nature of a corporation's presence in a particular state is determined on a case by case basis. See Athena Automotive, Inc. v. DiGregorio, 166 F.3d 288, 291 (4th Cir. 1999). Long, however, has declined to present any factors to the district court or to this Court that support a finding that the bulk of Regency Home Fashions' activities takes place in North Carolina rather than in New York. Indeed, when questioned at oral argument, counsel for Long represented that Long never intended to argue that diversity jurisdiction was improper.[3] Absent some other factors pointing to the substantial character of the Corporation's activities in North Carolina, the fact that one manufacturing facility is located in North Carolina does not detract from our finding that the bulk of the Corporation's activities takes place in New York, in which all of the Corporation's financial and sales offices are located, as well as its headquarters and chief officers. Accordingly, we find no basis in the record to conclude that North Carolina, rather than New York, is Regency Home Fashions' principal place of business. Thus, diversity jurisdiction is proper.
 
 IV.
 
 16
 Turning to the merits, Regency contends that the magistrate judge erred by denying its motion to compel arbitration and to stay proceedings pending arbitration. We review de novo the magistrate judge's conclusions regarding the arbitrability of the disputes between Regency and Long. See United States v. Bankers Ins. Co., 245 F.3d 315, 318-20 No. 00-1342, (4th Cir. March 27, 2001). Although we have previously articulated the governing standard for resolving the arbitrability of disputes, see American Recovery Corp. v. Computerized Thermal Imaging, Inc., 96 F.3d 88, 93 (4th Cir. 1996), the magistrate judge ignored this controlling precedent and instead applied a legal standard that has been rejected by this Circuit. After reviewing the arbitrability of Long's claims under the proper legal standard, we find that each of Regency's claims falls within the scope of the arbitration clauses of the 1972 and 1999 Agreements.
 
 A.
 
 17
 The Federal Arbitration Act applies to contracts"evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract." 9 U.S.C.A. S 2 (West 1999). The parties do not dispute that the FAA applies to the arbitration clauses contained in the 1972 and 1999 Agreements. The Supreme Court has announced its "healthy regard for the federal policy favoring arbitration" and has explained that the Federal Arbitration Act "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983). To that end,"the heavy presumption of arbitrability requires that when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration." Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co., 867 F.2d 809, 812 (4th Cir. 1989) (internal quotation marks omitted). Thus, we may not deny a party's request to arbitrate an issue "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."[4] United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960). Having established our principles for review, we turn to Regency's arguments.
 
 B.
 
 18
 Regency first argues that the magistrate judge erred by failing to apply the proper legal standard to determine the arbitrability of Long's claims against Regency. In American Recovery, we held that a broadly-worded arbitration clause applies to disputes that do not arise under the governing contract when a "significant relationship" exists between the asserted claims and the contract in which the arbitration clause is contained. See American Recovery, 96 F.3d at 93. The arbitration clauses contained in the 1972 and 1999 Agreements are worded in the same broad manner as the arbitration clause at issue in American Recovery. See id. (holding that an arbitration clause that provided arbitration for any dispute that "ar[ose] out of or related to" the agreement was a broad clause, "capable of expansive reach"). The 1972 Agreement states that it applies to "[a]ny and all disputes . . . arising out of or in connection with this Agreement." (J.A. at 64.) Similarly, the 1999 Agreement states that it applies to "any dispute arising out of or relating to this Agreement." (J.A. at 81); cf. Prima Paint Corp. v. Flook & Conklin Mfg. Co., 388 U.S. 395, 398 (1967) (labeling as "broad" a clause that required arbitration of "[a]ny controversy or claim arising out of or relating to this Agreement"); J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315, 321 (4th Cir. 1988) (declaring that the scope of a clause providing for the arbitration of "[a]ll disputes arising in connection with" a contract was identical to that of a clause providing for the arbitrability of disputes that "may arise out of or in relation to" an agreement and construing the arbitration clause to "encompass a broad scope of arbitrable issues."). Thus, the governing standard for determining the arbitrability of Long's claim is whether Long's claims have a significant relationship to the 1972 or 1999 Agreements.
 
 
 19
 Instead of applying the significant relationship test articulated in American Recovery, the magistrate judge relied upon cases decided under the standard enunciated in Mediterranean Enterprises v. Ssangyong Corporation, 708 F.2d 1458, 1463-64 (9th Cir. 1983), despite our explicit, unambiguous rejection of Mediterranean Enterprises in American Recovery when dealing with a broadly-worded arbitration clause similar to those in the 1972 and 1999 Agreements. See American Recovery, 96 F.3d at 92 ("We agree with CTI that the standard in Mediterranean Enterprises was an improper foundation for the district court's decision."). The magistrate judge further concluded that the 1972 and 1999 Agreements were narrow in scope, indicating that "the parties could not have possibly intended to bind themselves to arbitration of the claims raised." (J.A. at 106). As we noted in American Recovery, however, although the intention of the parties is relevant, "the intentions of parties to an arbitration agreement are generously construed in favor of arbitrability." See American Recovery, 96 F.3d at 94. Here, as in American Recovery, the parties explicitly agreed on arbitration clauses "that by[their] plain language ha[ve] a broad scope." See id. Thus, it is not inconsistent with the intentions of the parties to give the arbitration clauses broad effect. See id. Accordingly, we agree with Regency that the magistrate judge erred by refusing to apply American Recovery to determine the arbitrability of Long's claims.
 
 C.
 
 20
 Applying American Recovery's significant relationship test and bearing in mind the strong federal policy favoring arbitration, we examine each of Long's claims seriatim.[5]
 
 1.
 
 21
 In his first claim against Regency, Long contends that Regency's shareholders frustrated his reasonable expectations as a shareholder and an employee of the Corporation. In his complaint, Long bases his frustration of reasonable expectations claim on three types of expectations -(1) an expectation of continued employment; (2) an expectation of meaningful participation in the management and affairs of the Corporation; and (3) an expectation of a reasonable payout for his shares.
 
 
 22
 We agree with Regency that all of Long's expectations derive from the 1972 and 1999 Agreements; thus, Long's frustration of reasonable expectations claim is significantly related to both Agreements and is arbitrable. Long's expectation of continued employment for so long as Long was a shareholder arises directly from the 1972 Agreement, which states that Long would have continued employment for so long as he remained a shareholder. Long's expectation of meaningful participation in the management and affairs of the Corporation also arises directly from the 1972 agreement, which states that Long would be employed in "an executive capacity" during his time as a shareholder. (J.A. at 57.) Finally, Long's expectation of a reasonable payout for his shares derives directly from the 1999 Agreement, which superseded the 1972 Agreement's share redemption provisions. The value of Long's shares is based upon the redemption provisions set forth in the 1999 Agreement. Accordingly, proof of each aspect of Long's reasonable expectations claim depends on the terms and existence of the 1972 and 1999 Agreements. Thus, the magistrate judge erred by finding this claim not to be arbitrable.
 
 2.
 
 23
 In his second claim against Regency, Long argues that Silver and the other shareholders breached their fiduciary duties to Long as a shareholder in the Corporation. Long's breach of fiduciary duty claim arises only by virtue of Long's status as a shareholder, and the 1972 Agreement creates Long's status as a shareholder. Because Long would not have a valid breach of fiduciary duty claim but for the existence of the 1972 Agreement creating his status as a shareholder in the Corporation, we hold that Long's breach of fiduciary duty claim is properly referable to arbitration. Cf. Harter v. Iowa Grain Co., 220 F.3d 544, 549-51 (7th Cir. 2000) (affirming the district court's submission of a breach of fiduciary duty claim to arbitration).
 
 3.
 
 24
 Long's third claim is for breach of contract arising from Regency's termination of Long. Long contends that his termination breached the portion of the 1972 Agreement that provides that Long was entitled to continued employment for so long as he was a shareholder. Because this breach of contract claim arises directly under the 1972 Agreement, it is clearly arbitrable. See J.J. Ryan & Sons, 863 F.2d at 321 (noting that claims involving the "literal terms or performance" of the contract fall within the scope of even the most limited arbitration clauses).
 
 4.
 
 25
 Long's fourth claim is for failure to distribute profits proportionately. In support of this claim, Long alleges that the Corporation improperly redeemed shares from David Silver and that shares were transferred between shareholders without authority, diluting Long's rights and profits as a shareholder. The 1999 Agreement sets forth the rights of all the shareholders as to the proper redemption of shares and authority to transfer share ownership. Accordingly, proof of Long's claim will necessarily depend upon the terms of the 1999 Agreement and the construction of such terms. Thus, Long's claim for failure to distribute profits proportionately is significantly related to the 1999 Agreement. See American Recovery, 96 F.3d at 95 (noting that when proof of the claim is rooted in the terms and existence of the contract, the claim is arbitrable).
 
 5.
 
 26
 Long's fifth claim is for fraud. Long alleges in his complaint that he was fraudulently induced into entering into the 1999 Agreement, in that the parties coerced him into signing the agreement by promising him that if he signed the agreement, Long would be employed with the Corporation until he was seventy. As early as 1967, the Supreme Court held that a claim of fraud that related to inducement of an agreement generally is covered by an "arising out of or relating to this agreement" arbitration clause. Prima Paint, 388 U.S. at 406; see also Peoples Sec. Life Ins., 867 F.2d at 813-14 (holding that a fraud in the inducement claim is arbitrable). Thus, Long's fraud claim is significantly related to the 1999 Agreement and is subject to arbitration.
 
 6.
 
 27
 Long's sixth claim is for civil conspiracy. Long alleges that Regency conspired to obtain Long's signature on the 1999 Agreement for the purpose of preventing him from challenging their past fraudulent, self-serving dealings within the Corporation. To the extent Long's civil conspiracy claim is premised upon these allegations, similar to the fraud in the inducement claim, the conspiracy claim is significantly related to the 1999 Agreement and is, therefore, arbitrable. See, e.g., J.J. Ryan & Sons, 863 F.2d at 322 (holding that claim of conspiracy was significantly related to the contract and was, therefore, arbitrable); cf. Jeske v. Brooks, 875 F.2d 71, 75 (4th Cir. 1989) (holding that allegations of fraud, lack of consideration, overreaching, and unconscionability are arbitrable). To the extent the conspiracy claim is related to the shareholders' alleged breach of fiduciary duties and failure to distribute profits properly, Long's conspiracy claim is referrable to arbitration because it is significantly related to both the 1972 and 1999 Agreements, in that proof of the claim depends on the terms and existence of both agreements.
 
 7.
 
 28
 Long's seventh claim against Regency is for unfair and deceptive trade practices, both individually and in the shareholders' fiduciary capacities. To the extent this claim relates to the alleged fraud and/or conspiracy in inducing Long to sign the 1999 Agreement, the claim is arbitrable because it is significantly related to the 1999 Agreement. See J.J. Ryan & Sons, 863 F.2d at 319 (holding that an unfair and deceptive trade practice claim was "manifestly" in connection with the agreement and, thus, subject to arbitration). To the extent this claim relates solely to the alleged breaches of fiduciary duties, it is significantly related to the 1972 Agreement because the 1972 Agreement established Long's status as a shareholder, thereby creating the duties underlying the claim. Thus, we likewise find that Long's unfair and deceptive trade practices claim is subject to arbitration.
 
 8.
 
 29
 Long's eighth claim is for punitive damages with respect to all of the above claims. Because the issue of punitive damages was not exempted from the arbitration clauses by the governing agreements, Long's punitive damages claim is subject to arbitration. See Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 59-60 (1995) (holding that punitive damages claims are subject to arbitration unless the contract exempts such claims from the coverage of the arbitration clause).
 
 9.
 
 30
 Long's ninth claim is for a shareholder's derivative action. The 1972 Agreement specifically provides that Long's status as a shareholder ceases immediately upon his termination. Similarly, the 1999 Agreement provides for the redemption of Long's shares immediately upon his termination. Because Long can only claim a shareholder's derivative action if he is in fact a shareholder, the terms of these two agreements will necessarily be relevant to determining the viability of his shareholder derivative suit. Accordingly, the claim is significantly related to the two contracts and is properly referable to arbitration. See American Recovery, 96 F.3d at 93-95 (holding that when the proof of the claim is rooted in the existence or terms of the agreement, the agreement is significantly related to the claim).
 
 V.
 
 31
 Long argues that, despite applying the wrong standard to determine arbitrability, the magistrate judge was correct to deny arbitration because the shareholders were not parties to the 1972 Agreement. Long contends that the non-signatory shareholders cannot invoke the arbitration clause in the 1972 Agreement against Long.[6]
 
 
 32
 A non-signatory may invoke an arbitration clause under ordinary state-law principles of agency or contract. For example, in J.J. Ryan & Sons, 863 F.2d 315 (4th Cir. 1988), we explained that when allegations against "a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration agreement." See id. at 320-21; see also Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753, 757 (11th Cir. 1993) (holding that because claims against the non-signatory were "intimately founded in and intertwined with" a contract containing an arbitration clause, signatory was estopped from refusing to arbitrate those claims (internal quotation marks omitted)); Hughes Masonry Co. v. Greater Clark County Sch. Bldg. Corp. , 659 F.2d 836, 840-41 (7th Cir. 1981) (finding a signatory equitably estopped from repudiating arbitration clause in agreement on which suit against non-signatory was based).
 
 
 33
 In this context, we see little difference between a parent and its subsidiary and a corporation and its shareholders, where, as here, the shareholders are all officers and members of the Board of Directors and, as the only shareholders, control all of the activities of the corporation. Cf. Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995) (noting theories of contract and agency law as examples under which a non-signatory can compel arbitration, including agency and veil piercing/alter ego). As in J.J. Ryan, the facts and claims against the Corporation and its shareholders are so closely intertwined that Long's claims against the non-signatory shareholders of the Corporation are properly referable to arbitration even though the shareholders are not formal parties to the 1972 Agreement. Likewise, the claims under the 1999 Agreement, of which all shareholders were formal parties, are similar to and dependent upon the claims under the 1972 Agreement. If the non-signatory shareholders were forced to litigate the issues arising under the 1972 Agreement, the arbitration proceedings involving the 1972 Agreement against the Corporation, as well as the arbitration proceedings involving the 1999 Agreement, "would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted." Sam Reisfeld & Son Import Co. v. S.A. Eteco, 530 F.2d 679, 681 (5th Cir. 1976).
 
 
 34
 Moreover, Long seeks to claim the benefit of his shareholder status and right to continued employment by virtue of the 1972 Agreement against the non-signatories to the 1972 Agreement while "simultaneously attempting to avoid the terms of an arbitration provision contained therein." United States v. Bankers Ins. Co., 245 F.3d 315,0323, No. 00-1342, (4th Cir. March 27, 2001). Allowing Long to avoid the consequences of the 1972 Agreement while invoking its benefits in a suit against the shareholders would "both disregard equity and contravene [the FAA]." International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d 411, 418 (4th Cir. 2000 (internal quotation marks omitted)). Because all the parties in the present litigation were signatories to the 1999 Agreement, the issues arising under and relating to the 1999 Agreement are properly arbitrable. Additionally, because the facts and claims against the Corporation and its shareholders are inextricably intertwined and because Long is claiming the benefit of his shareholder and employee status by virtue of the 1972 Agreement in his suit against the Corporation and the shareholders, we hold that the non-signatory shareholders can compel arbitration against Long with respect to the issues arising under and relating to the 1972 Agreement.
 
 VI.
 
 35
 In summary, we hold that the district court erred by denying Regency's motion to compel arbitration and to stay proceedings pending arbitration because Long's claims fall within the scope of the arbitration clauses of the 1972 and 1999 Agreements. We further hold that the non-signatory shareholders may invoke the arbitration clause of the 1972 Agreement against Long. We remand for further proceedings consistent with this opinion.
 
 VACATED AND REMANDED WITH INSTRUCTIONS
 
 
 Notes:
 
 
 [1]
 The district court referred the case to a magistrate judge by consent of the parties for all proceedings. 28 U.S.C.A.S 636(c) (West 1993 & Supp. 2000); Fed. R. Civ. P. 73(b).
 
 
 [2]
 Although neither party addressed this issue, we are duty-bound to clarify our subject matter jurisdiction because questions of subject matter jurisdiction "`concern the court's very power to hear the case.'" OwensIllinois, Inc. v. Meade, 186 F.3d 435, 442 n. 4 (4th Cir. 1999) (quoting 2 James Wm. Moore et al., Moore's Federal PracticeS 12.30 [1] (3d ed. 1998)).
 
 
 [3]
 Waiver or estoppel principles cannot confer subject matter jurisdiction on a court that would otherwise lack it. American Fire & Cas. Co. v. Finn, 341 U.S. 6, 17-18 (1951). Nevertheless, where, as here, the record is bereft of any support, beyond a single conclusory allegation in Long's Complaint, for the conclusion that the Corporation's principal place of business is in North Carolina and instead supports a finding that the principal place of business is located in New York, we simply have no basis from which to conclude otherwise.
 
 
 [4]
 Although both the 1972 and the 1999 Agreements contain New York choice-of-law provisions, federal law continues to govern the arbitrability of Long's claims. See Smith Barney, Inc. v. Critical Health Sys. of North Carolina, Inc., 212 F.3d 858, 861 n.1 (4th Cir. 2000) (stating, in a case arising under an agreement containing a New York choice-of-law provision, that "[b]ecause arbitration contracts must be construed in accordance with federal law, we are not bound by New York state decisions").
 
 
 [5]
 We look to the provisions of the 1972 Agreement only to the extent the provisions of the 1972 Agreement do not conflict with those of the 1999 Agreement. Where the provisions conflict, we rely upon the 1999 Agreement.
 
 
 [6]
 Only Regency Home Fashions, via its predecessor, was a party to the 1972 Agreement. All of the shareholders, however, were parties to the 1999 Agreement.